256 S.W.2d 755 (1953)
GURLEY
v.
ST. LOUIS PUBLIC SERVICE CO.
No. 43050.
Supreme Court of Missouri, Division No. 2.
March 9, 1953.
Motion for Rehearing or to Transfer to Denied April 13, 1953.
Mattingly, Boas & Richards and Lloyd E. Boas, St. Louis, for appellant.
Albert E. Schoenbeck, St. Louis, for respondent.
Motion for Rehearing or to Transfer to Court en Banc Denied April 13, 1953.
WESTHUES, Commissioner.
This is an action for damages for personal injuries. Plaintiff Kenneth Gurley on the night of November 10, 1950, fell as he was stepping off a bus owned by the defendant St. Louis Public Service Company. He was not injured as a result of this fall but when the bus moved forward, the right rear dual wheels passed over the lower part of plaintiff's left leg. A trial resulted in a verdict for plaintiff in the sum of $29,500. From the judgment entered, the defendant appealed.
Defendant filed a motion in this court to remand the case for retrial. It was alleged in the motion that the defendant discovered new after trial evidence to the effect that plaintiff's injuries were not so serious as plaintiff's evidence tended to *756 prove. In the motion defendant asked that if we overruled the motion to remand, this court consider the newly discovered evidence on the question of the measure of damages. We shall dispose of the motion in the latter part of this opinion.
Defendant in its brief attempted to present three points for review. They are as follows:
"I. The Court erred in overruling defendant's motion for a directed verdict at the close of the whole case and erred in overruling defendant's motion for judgment in accordance with its motion for a directed verdict.
"II. The Court erred in giving and reading instruction number one.
"III. The verdict is grossly excessive."
Rule 1.08 of this court provides in part as follows: "The brief for appellant shall contain: * * * (3) The points relied on, which shall specify the allegations of error, with citation of authorities thereunder; * * *." (Emphasis ours.) In point one, as above-quoted, no reason is assigned that the court erred in not directing a verdict for the defendant. The same is true as to point number two. Defendant failed to specify any allegation of error. In carefully reading the argument in defendant's brief, we have concluded that the first point relied upon is that plaintiff's evidence was insufficient to make a case under the humanitarian doctrine. We would be justified in wholly ignoring the first two points in the brief.
While we have concluded that the defendant is correct in his argument that plaintiff failed to make a case under the humanitarian doctrine, McClanahan v. St. Louis Public Service Co., 363 Mo.___, 251 S.W.2d 704, loc.cit. 707(2), nevertheless, the evidence was sufficient for a jury to find primary negligence which we believe was submitted to the jury by the instruction under attack.
The evidence shows the following to have occurred: On the night of November 10, 1950, plaintiff was a passenger on a bus owned by the defendant company. The bus was westbound on Pershing Avenue.
When it neared Clara, Avenue, plaintiff signaled the operator to stop. When the bus came to a stop, the rear door was opened and plaintiff started down the steps. His foot slipped and plaintiff fell, landing in between the bus and the curbing. The motorman testified that he released the brakes of the bus and was in the act of starting the bus when he heard some people call to him to stop; that he immediately stopped the bus. Plaintiff testified that he fell in between the bus and the curbing and that when he noticed the bus moving, he attempted to jerk his legs from under the bus wheels but the right rear wheels caught his left trouser leg; that the bus stopped momentarily and then moved forward, the wheels passing over his leg. The bus driver Sanders gave the following testimony:
"Q. When you moved forward approximately how far forward did you move? A. The first time?
"Q. Yes, the first time. A. I would say two to three feet."
The bus driver testified that when he stopped after moving a few feet, he heard some people "hollering." Note his testimony concerning this point:
"Q. What did you hear the people say? A. It sounded like a lady's voiceThat I was on this man.
"Q. Do you remember their exact words? A. No, I don't remember the exact words, no sir.
"Q. Did you look back into your rear mirrors ? A. I don't remember I did at that time.
"Q. Did you open the rear door of the bus? A. I opened the front one.
"Q. Now, did you open the rear door of the bus? A. No.
"Q. Now, isn't it a fact that you heard the people say to reverse the bus?
A. I am not sure what they said. The way I understand it, the way I heard them was that I was on this man.
"Q. I am asking you: Didn't you hear them say to reverse the bus ? A.
They might have said that. I couldn't say for sure."
Sanders admitted that in a deposition he testified as follows.
*757 "`(Answer): Well, when I stopped the bus the first time after pulling away from Clara, these women hollered and said I was on him, to reverse my bus, I could understand that they said reverse it, and to reverse it I thought it would be more wise to move forward.
"`(Question): They told you to reverse the bus?
"(Answer): That is right.
"`(Question): But you instead of reversing the bus you pulled forward?
"`(Answer): That is right.'
"Q. Were those questions asked you and those answers made? A. They must have been."
Plaintiff was the only passenger on the bus. It was after 11:00 p. m. There were four or five people near the bus stop and the substance of the evidence as to what occurred may be shown by quoting from two of the witnesses. Mrs. Aileen Frain testified as follows:
"Q. You say you ran to the front of the bus. Was the front door of the bus open ? A. No, the driver opened the door when we screamed.
"Q. He opened the door of the bus ? A. Yes.
"Q. When you say you screamed to him, to the bus driver you mean? A. Yes.
"Q. Then what happened? A. Then we asked him to back up, to try to get this man's trouser or whatever was caught under the bus loose, and instead of that he just closed the door and went on, and went over the man's leg."
William Frain gave the following testimony:
"Q. Let me ask you this: Was the wheel up on to his leg? A. The wheel seemed to be in a position back of his leg and just over it.
"Q. Do you mean against the leg? A. Yes, sir. And as I tried to get him under the arm pits and pull him free of the bus, suddenly the thought struck me I could not move the man so I ran up to the side there and hollered, `Don't move this bus.'
"Q. Then what happened? A. Then I went back thinking I would have time to get the man loose. Just as I got him under the arm pits again, the bus went forward and I heard bones breaking."
The evidence was that plaintiff was not hurt until the bus wheels passed over his leg. We are of the opinion that the evidence justified a finding by a jury that the bus driver was negligent in not ascertaining for himself, before moving the bus forward, the position of plaintiff with reference to the bus. We can visualize the excitement at the time which may have confused the bus driver. Note Mr. Frain's description of the situation:
"Q. Now, can you tell me how come the bus and how long the bus moved from the time Kenneth Gurley got off it and you told the bus driver to hold still. A. Well, I would say probably because there were five other people in the crowd who were stamping around in front of the bus all screaming various admonitions to the driver not to pull forward.
"Q. Were they all saying that or were they saying `You are on a man' ? A. It would be impossible to say what they were saying."
We rule the question of whether the bus driver was negligent was for a jury to decide. Sullivan v. Kansas City Public Service Co., 363 Mo. 68, 248 S.W.2d 605, loc.cit. 609, 610(3); Smith v. Siedhoff, Mo. Sup., 209 S.W.2d 233, loc.cit. 238 (9) (10).
In the argument of the brief the defendant says that the court by instruction No. 1 submitted the case to the jury on humanitarian negligence. If that were true, the case would have to be remanded for retrial. The Sullivan and Smith cases, supra, so hold. We find that instruction No. 1 submitted primary negligence only. While it contains some phraseology usually found in instructions submitting humanitarian negligence, it could not be approved as such. In the first part of this instruction, the occurrences leading up to the time plaintiff's *758 trouser leg was pinned under the bus wheels were stated, thus presenting to the jury, if they found the facts to be so, that plaintiff was in a precarious position. The instruction then submitted to the jury the question of whether the bus driver should have known plaintiff's position of peril but nevertheless negligently moved the bus forward. A similar situation was presented to this court in the Smith case, supra. At page 238 of 209 S.W.2d (9), the court made the following comment: "It was not a failure to stop that caused this accident. The accident resulted from moving on under the existing circumstances, after the truck had been stopped." The court held that primary negligence and not humanitarian negligence was the proper basis upon which to have submitted the case to a jury. That rule applies in this case. Instruction No. 1 correctly submitted primary negligence, that is, whether the bus driver was negligent in moving the bus forward under the circumstances then existing.
Defendant contends the verdict of $29,500 is grossly excessive. The newly discovered evidence mentioned in the motion to remand is with reference to plaintiff's injuries. Plaintiff testified he was unable to walk without the aid of crutches. The trial ended on October 18, 1951. A motion for new trial filed on October 22, 1951, was overruled on December 31, 1951. On January 4, 1952, defendant filed his notice of appeal. On January 14, 1952, defendant filed its motion in the trial court asking that the order overruling the motion for new trial, filed on October 22, 1951, be set aside and a new trial granted. The grounds of this motion were that the defendant through one of its investigators had observed plaintiff walking without crutches; that such fact could be proven by the evidence of the investigator and substantiated by 95 feet of film. The trial court permitted the defendant to introduce its evidence but denied the motion on the ground that after the appeal had been taken the trial court had no jurisdiction to act. Defendant then on this appeal filed the motion to remand as above-mentioned. The evidence of the investigator was that on January 13, 1952, he saw plaintiff driving a car; that he followed him to a tavern located at 525 DeBaliviere where he observed plaintiff cleaning the floor of the tavern with a broom or mop; that plaintiff was not using crutches; that on that same day he saw plaintiff drive his car to 2729 Semple Avenue where he entered a house at that address; that he was walking without crutches. The investigator testified that the 95 feet of film were taken of plaintiff's movements at the Semple Avenue address. Plaintiff offered no evidence at this hearing. The court held it did not have jurisdiction. Affidavits were filed in this court by plaintiff. One was signed by Marshall Whittaker wherein it is stated that affiant owned the tavern located at 525 DeBaliviere and that the plaintiff at no time was employed by him; that the work of cleaning was done by Arthur Fulton, a Negro. Arthur Fulton signed an affidavit wherein it is stated that he cleaned the tavern by mopping it on January 13; that he did not see plaintiff and that "No white man did my work for me on that day or any other day."' Plaintiff filed an affidavit wherein he stated he was not in the tavern mentioned on January 13 and furthermore "Since the time of trial of the case in the Circuit Court of the City of St. Louis in October 1951, I have always worn the long leg brace on my foot and leg or I have used crutches to assist me in walking or I have used both the brace and the crutches; the only exception to this has been on occasion at home when for short periods of time I have used neither the brace nor the crutches."
In Curry v. Thompson, Mo.Sup., 247 S.W.2d 792, this same situation was before Division I of this court. It was there ruled that the trial court lost jurisdiction when the case was appealed. It was also ruled that courts should be reluctant to order a new trial to relitigate matters that were once in issue at a trial. In examining the record in this case, we find that the question of whether plaintiff was able to walk without crutches was in fact an issue in the case.
The investigator who obtained the alleged after trial evidence testified in the trial of the case. His testimony was that on August 10, a month or so before the trial, he *759 checked on plaintiff and found him mopping the bathroom floor of his home. Note his evidence as to plaintiff's ability to walk:
"Q. Can you tell me whether or not he was standing on both two feet? A.
Yes, he was. Scrubbing that back and forth.
"Q. I believe you said you saw him move around? A. Yes, sir.
"Q. Did you see him walk? A. Yes.
"Q. Can you tell me whether or not you noticed anything peculiar about his walk, or unusual? A. No, sir. I tried to observe as closely as I could and to me he had no apparent disability. He could walk normally as far as I could see.
"Q. Was he using crutches at the time ? A. No, sir, he was not.
"Q. Did he have his crutches about him? A. I did not see them."
Dr. J. P. Murphy was a witness for the defendant. Note what he said:
"Q. Now, Doctor, after having examined this boy and looking at your X-raysI believe you took X-rays of the foot and kneecan you tell me whether or not in your opinion he can bear weight? A. Yes, I think he can. Yes, sir.
"Q. Can you tell me whether or not he can walk? A. Yes, sir."
It is evident that the question of plaintiff's ability to walk was litigated. It is also evident from the record that the newly discovered evidence would be sharply disputed on a retrial. We, therefore, deny the motion to remand.
On the merits of the question of damages we find the following: Plaintiff was about thirty years old when he was injured. When he was a small child he had a siege of polio. Later, when he was about eleven years old, he underwent an operation on his left knee and leg which had been shortened by the previous illness. As a result of polio, a great portion of the muscles of his left leg were destroyed causing a foot drop and a limp. However, the leg was sufficiently strong so that plaintiff was able to do manual labor and had worked at jobs such as painting, driving trucks, and as a plumber's helper. After passing a physical examination, he had worked as a crane operator at the Puget Sound Navy Yards. In November before the accident, after passing another required physical examination, he obtained work at the McDonnell Aircraft Corporation. At the time of his injury, he was returning home from work at this plant. The record shows that while plaintiff had worked at a number of places and at various kinds of labor, he was generally employed and was capable of earning approximately $3,000 per year.
As a result of the accident, plaintiff had three fractures of the left tibia, one of which was a spiral fracture; the cartilage of the knee was broken causing blood to enter the joint. A surgical operation was required to remove this blood from the knee joint. As mentioned above, plaintiff's leg muscles had been reduced and partially destroyed by polio. As a result of the accident with the bus, the use of the already weakened leg was practically gone. Dr. Richard O'Dell testified that in his opinion plaintiff would never be able to walk without a leg brace or would "eventually come to an arthrodesis or fusion of the knee," through an operation which would result in rendering the knee joint permanently stiff. Plaintiff at the time of the trial was still suffering from traumatic neurosis. He had been sent to McMillan Hospital for treatment therefor. In addition to that he had to undergo other treatment which was extremely painful. Hospital and doctor bills were substantial and the loss of wages up to the time of trial amounted to about $3,000. There is no doubt that plaintiff's earning capacity has been materially impaired; nor that his leg will be permanently defective, much more than it had been before he was injured by the bus. However, the evidence of plaintiff's doctors indicates that there is a probability that plaintiff will in time be able to walk with a leg brace and that his neurosis will subside.
We have read and considered the cases cited by the plaintiff and by the defendant *760 as well as many others. some of the cases are helpful; some are not, depending on the similarity of the circumstances. Plaintiff cited such cases as O'Brien v. Louisville & Nashville R. Co., 360 Mo. 229, 227 S.W.2d 690; Tatum v. Gulf, Mobile & Ohio R. Co., 359 Mo. 709, 223 S.W.2d 418; Cruce v. Gulf, Mobile & Ohio R. Co., 361 Mo. 1138, 238 S.W.2d 674; Chrum v. St. Louis Public Service Co., Mo.Sup., 242 S. W.2d 54. Among the cases cited by the defendant are Young v. City of Farmington, Mo.Sup., 196 S.W.2d 124; Lanasa v. Downey, Mo.App., 201 S.W.2d 179; Hill v. St. Louis Public Service Co., 359 Mo. 220, 221 S.W.2d 130; and Venditti v. St. Louis Public Service Co., 362 Mo. 339, 240 S.W.2d 921.
The Young, Lanasa, and Venditti cases, supra, do not help us in deciding the present case. In each case the amount of the judgment as entered in the trial court was upheld. That does not mean that this court would not have sustained a verdict for larger sum. In the Hill case, supra, a verdict for $22,500 was reduced by $7,500. The injuries sustained by Hill were not as serious as those sustained by plaintiff Gurley. Hill was required to wear an Ace bandage, or an elastic support, on his leg. Gurley will be required to wear a metal brace from his ankle to the upper part of his leg. Hill did not suffer any mental disturbance. Gurley was at the time of the trial still suffering from traumatic neurosis. In view of the medical evidence this was not a small part of the damage to plaintiff.
Considering the evidence in its most favorable light to plaintiff, we are of the opinion that $20,000 is ample for the injuries resulting from the accident in this case. If, therefore, plaintiff will within fifteen days enter a remittitur of $9,500, the judgment will be affirmed in the sum of $20,000 as of the date it was entered in the circuit court; otherwise, the case will be reversed and remanded for retrial. It is so ordered.
BOHLING and BARRETT, CC., concur.
PER CURIAM
The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court.
All concur.